MANISH KUMAR (CSBN 269493)
LESLIE A. WULFF (CSBN 277979)
MICAH L. RUBBO (CSBN 267465)
U.S. Department of Justice
Antitrust Division
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, CA 94102
Manish.Kumar@usdoj.gov
Telephone: (415) 934-5300

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

UNITED STATES OF AMERICA

v.

CHRISTOPHER LISCHEWSKI,

Defendant.

NO. CR 18-00203 EMC

**UNITED STATES' NOTICE OF MOTION AND MOTION TO DESIGNATE CERTAIN MATERIALS AS HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER**

Date: October 24, 2018
Time: 2:30 p.m.
Court: Honorable Edward M. Chen, Courtroom 5

## NOTICE OF MOTION

PLEASE TAKE NOTICE that the United States hereby moves pursuant to Crim. L.R. 47-1 for an order designating that certain documents produced as discovery in this matter be treated as Highly Confidential under the terms of the Protective Order entered into by the parties to this matter.

The United States' Motion is based on this Notice and the Points and Authorities in support of this Motion submitted herewith.

## STATEMENT OF RELIEF

Pursuant to the procedure set forth in the Protective Order in this matter, if the defendant challenges a "Highly Confidential" designation of certain discovery by the government, the government must within ten days justify that designation to the Court. ECF No. 40 at 2. The government seeks an order by the Court to designate certain documents as Highly Confidential.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. HIGHLY CONFIDENTIAL DESIGNATION IS NECESSARY

The Sherman Act, 15 U.S.C. § 1, preserves open competition in the marketplace by prohibiting unlawful "restraint[s] of trade." Mr. Lischewski has been charged with a single-count violation of the Sherman Act for "enter[ing] into and engag[ing] in a combination and conspiracy to suppress and eliminate competition by fixing prices for packaged seafood sold in the United States." (ECF No. 1 ¶ 7.)

Until his indictment, Mr. Lischewski was the Chief Executive Officer and President of Bumble Bee Foods, LLC. (ECF No. 1 ¶ 3.) Mr. Lischewski is on administrative leave from Bumble Bee through the conclusion of the criminal case. (Decl. of Leslie A. Wulff in Supp. of United States' Req. ¶ 3) ("Wulff Decl.") The government does not know whether he will return to the packaged-seafood industry at the conclusion of trial or in what role. (Wulff Decl. ¶ 3.)

Grand jury investigations into potential violations of the Sherman Act regularly involve the collection and analysis of sales, pricing, and financial data from competitors in a particular industry. That is true in the current case. Here, the grand jury collected documents from many sources, including the three main packaged-seafood producing firms in the United States: Bumble Bee; Tri-Union Seafoods, LLC d/b/a Chicken of the Sea International ("COSI"); and StarKist Co. A significant percentage of the documents produced by Bumble Bee and its competitors include discussions of and

information relating to pricing, procurement, corporate finance, and business strategy. Permitting this information to be broadly disclosed would subvert the same markets that the Sherman Act is designed to protect.

As part of the criminal discovery in this case, the government has produced grand jury materials, including documents containing trade-secret information and other sensitive business information, to the defendant and his counsel. Defendant and his attorneys may in turn share the discovery materials with potential witnesses with whom they consult in preparing a defense. In some instances, those potential witnesses may be current or former employees of packaged-seafood firms.

Neither Mr. Lischewski nor the potential industry witnesses would be in a position to have access to these documents absent this criminal case. In recognition of the sensitivity of the information contained in the discovery, the parties entered into a stipulated Protective Order limiting the uses and disclosure of the discovery. (ECF No. 40.) The vast majority of documents produced by the government are considered "Protected Material" under the Stipulated Protective Order and are governed by a set of standards regarding their permissible uses and disclosures. However, for a small percentage of documents, the parties agreed that additional protections were necessary in order to appropriately safeguard the trade-secret information contained therein. As a result, the Protective Order includes a procedure whereby materials "consist[ing] or contain[ing] 'trade secret' information'" can be designated Highly Confidential. (*Id.*) Of the over 2.2 million documents produced in discovery, the government has sought to designate only seventy documents as Highly Confidential. Mr. Lischewski has challenged sixty-four of these designations.[1]

## II. HIGHLY CONFIDENTIAL RESTRICTIONS ARE NARROWLY TAILORED

The limitations on the disclosure of Highly Confidential material were negotiated by the parties to be only as restrictive as necessary to protect the trade-secret information contained therein while balancing the defense's need to prepare for trial.

The Protective Order does not limit what information may be shared with or viewed by Mr.

---

[1] As illustrated in Exhibit A to the Wulff Declaration, several of the COSI documents correspond to more than one Bates number. (Wulff Decl. ¶ 4, Ex. A.) These additional Bates numbers represent duplicate versions of the same document. (*Id.*)

Lischewski. As the defendant, Mr. Lischewski has access to all discovery produced by the government, including Highly Confidential materials. The only limitation as to Mr. Lischewski is his ability to retain copies of the Highly Confidential materials in their original form outside the presence of counsel. The Protective Order places no other limitations on Mr. Lischewski's access to the Highly Confidential materials. Mr. Lischewski can view the Highly Confidential materials in their original form in the presence of his counsel. Both Mr. Lischewski and his counsel are in California and Mr. Lischewski owns property in the Northern District of California, where his counsel is located. Additionally, Mr. Lischewski can retain copies of information derived from Highly Confidential materials once those materials have been aggregated or summarized by his counsel or their experts.

The restrictions on Highly Confidential material are also narrowly tailored regarding the disclosures that may be made to third parties. Highly Confidential material may be shared with expert witnesses. As a result, the Highly Confidential designation does not restrict the ability of the defense to consult with an expert witness in preparation for trial. Additionally, Highly Confidential material may be shared with non-party potential witnesses who are currently or formerly employed in the packaged-seafood industry as long as the material "originated from the non-party's employer and was created during the non-party's employment." (ECF No. 40.) The Protective Order even allows defendant to challenge this term as to a particular witness by an under seal Ex Parte Application to the Court if necessary. (*Id.*) This limitation was negotiated to protect against the disclosure of one company's trade-secret information to individuals who are or were previously employed by that company's competitor. Non-party potential witnesses who work or have worked in the packaged-seafood industry have no need to review their competitors' trade-secret information in order to assist the defense in preparing for trial.

These restrictions, both as to Mr. Lischewski and as to third parties, are only as restrictive as necessary to reasonably protect the trade-secret information contained in the Highly Confidential materials. Further, Mr. Lischewski's counsel agreed to these limitations as part of the parties' protracted negotiations regarding the Protective Order.

## III. DOCUMENTS ARE APPROPRIATELY DESIGNATED HIGHLY CONFIDENTIAL

Mr. Lischewski has objected to the government's designation of sixty-four StarKist and COSI documents as Highly Confidential. As described below, these documents contain sensitive pricing

strategy and procurement information that consist of or contain trade secrets and are appropriately designated Highly Confidential under the Protective Order.

**A. COSI Documents**

The COSI documents for which the government has requested Highly Confidential treatment contain information regarding COSI's distribution and promotional strategy—two key areas of competition among the packaged-seafood companies. The data in these documents would allow a competitor to determine how COSI structures its promotional strategy and how that promotional strategy impacts the company's finances. Specifically, the data would allow a competitor to derive COSI's strategy for prioritizing promotions between different categories of retailers and different categories of products. This information could be used to undermine COSI's ability to negotiate with customers and price competitively in the market. To avoid this likely harm to its competitive position in the market, COSI does not share the information in these documents outside the company. COSI has requested that these documents be designated as Highly Confidential.

These documents are forward-looking planning documents. They do not reflect the actual prices COSI charged its customers. The government has not requested Highly Confidential treatment for COSI's historic pricing data.

The COSI documents to whose designation Mr. Lischewski objects fall into five different categories. The government will address each category in turn. (Wulff Decl. ¶ 4.)

1. <u>Grocery Guidelines</u>

The documents in the Grocery Guidelines category contain the company's promotional price targets for each quarter. (Wulff Decl. ¶ 5, Ex. B.) COSI's promotional price targets reveal the company's promotional pricing strategy at different categories of retailers for different categories of products. (*Id.*) While the exact values in these documents change over time based on market conditions, the company's overall promotional pricing strategy remains relatively stable. (*Id.*) As a result, the pricing information in these spreadsheets could be used to derive the company's current promotional pricing strategy, which would allow a competitor to negotiate against that strategy to COSI's detriment.

2. Profit and Loss Guidelines

The documents in the Profit and Loss Guidelines category incorporate the underlying data from the documents in the Grocery Guidelines category and can therefore be used to determine the company's promotional strategy. (Wulff Decl. ¶ 6, Ex. C.) In addition, these documents contain data that reveals how the success of COSI's promotional pricing strategy impacts the company's ability to meet its overall financial goals and projections. (*Id.*) The data contained in these documents could therefore be used to assess how the company's promotional strategy impacts COSI's gross margins and ability to implement its operating plan. Again, because the company's overall promotional strategy and financial goals remain relatively constant, this data could be used to derive the company's current promotional strategy and, in turn, the impact of that strategy on the company's current financial status. (*Id.* ¶ 5.)

3. Master Reports

The documents in the Master Reports category contain the same promotional price targets that are contained in the Grocery Guidelines documents, but in a different format. (Wulff Decl. ¶ 7, Ex. D.) Therefore, these documents can also be used to derive COSI's promotional pricing strategy. (*Id.* ¶ 5.) As described above, that information would allow a competitor to negotiate against COSI to its detriment in the marketplace.

4. Master Distribution Drive

The Master Distribution Drive contains similar promotional price targets that can be used to derive COSI's promotional pricing strategy as described in the above categories of documents. (Wulff Decl. ¶ 8, Ex. E.) However, this particular document also contains COSI's slotting allowances by item and retailer. (*Id.*) Slotting allowances are the costs that a packaged-seafood company pays to have its products displayed on a retailer's shelf. (*Id.*) Slotting allowances are confidential. (*Id.*) This information could be used to derive COSI's strategy for negotiating slotting allowances at specific retailers and any cost advantages the company has been able to achieve as a result.

Additionally, this document contains COSI's profit and loss data at each of its customers. (*Id.*) Although the profit and loss data is historical, it directly impacts COSI's distribution and promotional strategy. (*Id.*)

5. Master File

The Master File contains information that is similar to the data in both the Grocery Guidelines and Master Distribution Drive documents. (Wulff Decl. ¶ 9, Ex. F.) In addition to the promotional pricing strategy and slotting information, the Master File also contains information regarding COSI's cost of goods sold ("COGS"). (*Id.*)

**B. StarKist Documents**

Mr. Lischewski has objected to every Highly Confidential designation that the government has requested for StarKist documents. The designations to which Mr. Lischewski objects apply to documents containing information that StarKist does not disclose to outside parties. In fact, the data is so confidential that the company limits employee access based on the type of information. Only the CEO and CFO of StarKist have access to all the information contained in these documents. (Wulff Decl. ¶ 10.) StarKist would suffer competitive harm were these documents not treated as Highly Confidential and has requested that the government make this designation on its behalf.

The StarKist documents that Mr. Lischewski is objecting to fall into five different categories. The government will address each category in turn.

1. Profit and Loss Files

These documents contain data from September 2010 through December 2016 and detail the cost to StarKist and the price paid by the customer, including negotiated rebates and discounts, for every product sold by the company during that time period. (Wulff Decl. ¶ 11, Ex. G.) As a result, these files contain a record of StarKist's profitability on a product-by-product, sale-by-sale, and customer-by-customer basis. Although the data is historical, it reflects StarKist's strategy for negotiating rebates and discounts with its customers, which can be used to derive the company's current promotional strategy. (*Id.*)

2. Transactional Files

These documents contain data from September 2010 through December 2016 and show the rebates and discounts that StarKist negotiated with each customer. (Wulff Decl. ¶ 12, Ex. H.) This data could be used to provide a competitor with insight into StarKist's strategic bidding positions and its financial targets. Much like COSI, StarKist competes on the basis of its promotional strategy and would

suffer a competitive harm were this information not to be treated as Highly Confidential.

3. Raw Fish Purchase Files

These documents contain data from September 2010 through December 2016 and list the purchase details for all raw fish acquired by the company, including information about its suppliers. (Wulff Decl. ¶ 13, Ex. I.) Because raw fish costs are a large component of the final product price, having access to StarKist's purchase prices and underlying data would allow a competitor to determine StarKist's margins and have insights into how StarKist sets its promotional strategy based on these underlying costs. Moreover, the data reveals the identity of the boats from which StarKist purchases its fish. (*Id.*) StarKist has fostered relationships with certain boat owners and keeps the identity of these boat owners confidential. (*Id.*) Were StarKist's competitors to have access to the identity of the company's trusted suppliers, those competitors might be able to interfere with the relationships that StarKist has developed. These relationships are particularly important as the industry evaluates the future of MSC-certified and pole and line caught products.

4. Fish Fill and Recovery Data File

These documents contain data from 2009 through 2017 that details the amount of fish that StarKist packs into its finished products and the amount of useable fish product StarKist recovers from the raw fish it purchases from suppliers. (Wulff Decl. ¶ 14, Ex. J.) This data is vital to the company's profitability. It would reflect any proprietary techniques StarKist may have for recovering useable fish product from raw fish and the amount of fish it packs into its finished goods.

The government notes that Mr. Lischewski has not objected to designating either COSI or Bumble Bee's fish fill data as Highly Confidential.

5. Transport Data File

This document contains StarKist's transport costs from May 2012 to December 2016 and relates to the raw fish purchase data described above. (Wulff Decl. ¶ 15, Ex. K.) This cost data permits a competitor to draw inferences regarding how StarKist sources its fish based on the costs associated with transporting that fish to StarKist's warehouses.

\\

\\

In conclusion, the government requests that the Court issue an order designating certain StarKist and COSI documents as Highly Confidential because they contain trade-secret information and the restrictions on the disclosure of Highly Confidential material are narrowly tailored to balance the privacy concerns associated with the data and the defense's need to prepare for trial.

DATED: October 5, 2018

Respectfully submitted,

/s/__________________
MANISH KUMAR
LESLIE A. WULFF
MICAH L. RUBBO
U.S. Department of Justice
Antitrust Division